IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re:<br>CHARLES K. BRELAND, JR.,<br>　Debtor; | Case No.: 16-2272-JCO<br>Chapter 11 |
| In re:<br>OSPREY UTAH, LLC,<br>　Debtor. | Case No.: 16-2270-JCO<br>Chapter 11 |

MEMORANDUM OPINION AND ORDER

This matter came before the Court on November 13, 2017, for an evidentiary hearing on the Trustee's Motion to Approve Compromise Under Rule 9019 (Docs. 571, 644) and Debtor's Response in Opposition thereto. (Doc. 684).[1] The hearing took place over the course of two days and the parties were given additional time thereafter to file by brief their closing arguments and position statements regarding the evidence presented, which they did. (Docs. 829, 830). The Bankruptcy Administrator also filed his position statement in support of approving the proposed compromise. (Doc. 828). The matter is now ripe for resolution.

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157, and the order of reference of the District Court dated August 25, 2015. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and the Court has authority to enter a final order.

---

[1] Unless otherwise specified, all document citations reference the document number in *In re Charles K. Breland, Jr.,* 16-2272-JCO.

This proposed settlement consists of two parts: the first part is in regard to real property interests in Carbon and Emery Counties, Utah, (hereinafter "the Property"), which Debtor[2] holds jointly with creditor Levada EF Five, LLC ("Levada"). These real property interests are listed as assets in Osprey Utah, LLC's Schedule A/B. (*In re Osprey Utah, LLC,* 16-2270-JCO, Doc. 31 at 3). The second part consists of two appeals pending before the Eleventh Circuit and an Adversary Proceeding pending before this Court (hereinafter "the Lawsuits"),[3] all three of which the Trustee proposes be dismissed with prejudice due to the Lawsuits' negative value to the Estate. Having considered the record before it, the motions and responses, the evidence presented at the hearing, and the arguments of the parties, the Court finds that the Motion to Approve Compromise is due to be and hereby is DENIED without prejudice due to the Trustee's failure to carry his burden to prove that the settlement is reasonable. The Court further finds as follows.

FINDINGS OF FACT

The Chapter 11 Trustee, A. Richard Maples, was appointed on May 3, 2017, (Docs. 382, 391), and was therein charged with the management of Debtor Charles K. Breland's individual bankruptcy estate for the interest of the estate and creditors. By

---

[2] Osprey Utah, LLC is the Debtor in the Chapter 11 case styled *In re Osprey Utah, LLC,* 16-2270-JCO, which is pending before this Court. Osprey Utah, LLC is the entity which owns the real property interests at issue and the entity is owned and controlled by Charles K. Breland, Jr. Charles K. Breland, Jr., is an individual Chapter 11 Debtor in the case styled *In re Charles K. Breland, Jr.,* 16-2272-JCO, which is also pending before this Court. The *Osprey Utah* case and the *Charles K. Breland, Jr.* individual case are treated as companion cases, and any reference to the "debtor" refers to Charles K. Breland, Jr., and any reference to the Estate refers to the estate of the individual case, as the *Osprey Utah* case will be dismissed if this settlement is approved.

[3] The two appeals are not listed as assets in either *Osprey Utah, LLC* case or the Debtor's individual case. The Adversary Proceeding is listed as an asset in the *Osprey Utah* case. (Doc. 31 at 5).

2
Case 16-02270 Doc 285 Filed 02/14/18 Entered 02/14/18 15:58:01 Desc Main
Document Page 2 of 20

virtue of managing the Debtor's individual estate, Mr. Maples is likewise in control of the estate in the *Osprey Utah* case, since the Debtor is the sole owner of that LLC. In order to streamline and reduce the complexity of these two cases, and to avoid the continuing administrative expense of keeping the *Osprey Utah* case open, the Trustee proposed the settlement herein for court approval. When the Settlement was originally filed, it proposed to transfer all of Osprey Utah's property interests in the Property to Levada for a credit against Levada's proof of claim, which it filed in both Chapter 11 cases. The proof of claim currently filed is in the amount of $3,275,618.40. (16-2270, Claim 2-1, 16-2272, Claim 15-1). The Settlement results in a reduction in the claim of $1,427,922.50. (Doc. 644 at 9). In addition to the transfer of all of Osprey Utah's property interests, the settlement seeks the dismissal of three cases, two appeals pending in the Eleventh Circuit and an Adversary Proceeding in this Court, it also includes releases covering all three cases (hereinafter collectively referred to as the "Lawsuits") pending before this Court. The property interests and the Adversary Proceeding are Osprey Utah's only assets or potential source of income, the transfer and dismissal of which would result in the dismissal and closure of the *Osprey Utah* case. Lastly, the settlement proposes that Levada will, for $150,000.00, purchase William and Linda Donado's (hereinafter "the Donados") 25% mineral interest in the Property, and Levada will assume the liability to fully pay the judgment of the Donados, who have also filed a proof of claim in the amount of $250,000.00 based on the judgment entered in their favor by United States District Court Judge Steele (hereinafter collectively referred to as the "Donado judgment"). (*See* 16-2270 Claim 1-1; Judgment in *Utah Reverse Exchange, LLC, et al. v. Linda Donado,* 14-408-WS-B (Docs. 126, 128)). The Donado judgment is

3

Case 16-02270    Doc 285    Filed 02/14/18    Entered 02/14/18 15:58:01    Desc Main
Document      Page 3 of 20

also the subject of one of the Eleventh Circuit appeals noted above. Levada agrees to forbear from all collection actions on this judgment, except to the extent that Levada's reduced claim is not paid in full. (Doc. 644 at 7).

The Court heard testimony from the Trustee; two experts, Craig Warren and Gordon Lowe, regarding the value of the Property; Adrian Zajac, sole member of Argos Investment Partners, LLC which is the managing member of creditor, Levada EF Five, LLC; and Charles K. Breland, Jr., the Debtor.

The matter before this Court is the Trustee's Motion to Approve Compromise Under Rule 9019, and as such, it is the Trustee's burden of proof. Mr. Maples testified that he has been in the practice of law since 1972 and has been doing Chapter 11 bankruptcy work since the early 1980's. The Trustee testified that the genesis of the issues sought to be settled is the Amended and Restated Agreement, (hereinafter the "ARA"), which is the contract entered into between Debtor and Levada during Debtor's prior 2009 Chapter 11 bankruptcy case before this Court.[4] The ARA was presented to the Court on May 2, 2011, post-confirmation, as a nonmaterial modification to the confirmed plan. (Doc. 644 at 5). The Court approved the modification, and it has been the source of great controversy since then.

The Trustee testified that the ARA sets out the rights and duties regarding the Property belonging to Debtor and Levada. Mr. Maples testified that under the ARA, the Estate owns an undivided 1/3 surface revenue interest and that the revenue is generated

---

[4] At that time, the now-retired Honorable Margaret A. Mahoney was the bankruptcy judge assigned to the 2009 case.

from hunting leases and timber rights. He also testified that Levada owns 100% of the surface in fee.

Regarding the Estate's mineral rights, the Trustee testified that creditors William and Linda Donado (hereinafter "the Donados") own 25% of the minerals (as set out by the Donado Judgment), that the Estate owns 8.3% with the remaining rights belonging to Levada. The Trustee testified that executive control over the property is vested in Levada, and that the Estate has little to no control over the Property. He testified that Mr. Breland (as owner of the Osprey Utah, LLC entity) and Levada have owned the property since 2011, and because it is considered high desert property, with little water, questionable timber and no coal mining activity, the Property remains largely undeveloped.

All parties agree that the deeds conveying the Property interests between Debtor and Levada clearly reference the ARA, and, all parties agree that there is a discrepancy between what the ARA says each party's interest is versus what the deeds say each party's interest is. This discrepancy raises the question of whether Osprey Utah's interests in the Property is one third or one half of the remaining property. The Trustee agreed that there is an actual discrepancy between the two documents, and, which document controls could largely effect an increase or decrease in the property interests of each party. The Trustee testified he believes resolving that discrepancy may require extensive litigation, and that there is value in avoiding that litigation by a complete termination of the ARA by way of this settlement.

The Court has read the ARA multiple times and notes that it is complex, and less than artfully drafted.

5

Case 16-02270    Doc 285    Filed 02/14/18    Entered 02/14/18 15:58:01    Desc Main
Document      Page 5 of 20

The Trustee testified that he relied on Levada's interpretation of the ARA to formulate the initial terms of the settlement. Notably, the Trustee also testified that despite considering the 2009 case record in total, it was only *after* he entered into the proposed settlement with Levada (pending Court approval) that he learned of the discrepancy through discovery requested by Debtor. Because the discrepancy could result in the Debtor having an interest up to 17% higher or lower than what the Trustee originally factored into the settlement, he negotiated an additional $100,000.00 credit reducing Levada's claim, which he dubbed a "sweetener." The "sweetener" increases Levada's credit to roughly $1.5 million. He testified that it is his business judgment that this is reasonable compensation to the Estate for the transfer of its entire bundle of interests bestowed by the ARA.

When the ARA was executed, it placed multiple obligations on both Debtor and Levada concerning their individual duties and responsibilities regarding the Property— the performance or non-performance of which could result in shifting ownership interests. For instance, Levada was charged with certain development and drilling duties on the Property, and, if Levada chose not to perform those duties, then approximately 55% of the surface rights of the Property would revert back to the Debtor. Levada was also assigned the duty of paying the taxes on the Property. The Debtor was assigned the duty of delivering certain gas taps to Levada within 120 days of the closing date.

At some point after the ARA was signed, Levada and the Mr. Breland made competing claims against each other for breach of contract. These breaches formed the basis of the lawsuit, *Charles K. Breland, Jr., et al. v. Levada EF Five, LLC,* 14-158-CG-C before United States District Court Judge Granade (hereinafter, the "Levada Lawsuit").

6

The issues were tried before a jury and the jury returned a verdict in favor of Levada. Specifically, the jury found that Levada was not in breach of the ARA for its failure to drill or develop the property, and that Levada was not in breach due to its failure to pay the taxes on the Property. These favorable verdicts resulted in an award of damages to Levada with the final judgment amount awarded to Levada being $2,397,695,94. Although the resolution of this lawsuit did not terminate the ARA, it appears to have made compliance with the ARA an impossibility. Both parties are thus still bound by the ARA, and their rights in the Property are so inextricably intertwined that neither has clear title. For these reasons, the Trustee testified, and the Court agrees, there is significant value in terminating the ARA; however, insufficient evidence was presented as to the value assigned to this significant transfer of rights.

In addition to the discrepancy between the ARA and the conveyance deeds regarding the percentage of property rights between the parties, Mr. Breland disputes whether the ARA allowed pre-sales. This dispute forms the basis of the fraud-on-the-court Adversary Proceeding which the Trustee seeks to dismiss with this proposed settlement.

Prior to this Court approving the ARA as an amendment to Mr. Breland's 2009 plan, Levada entered into a pre-sale for 7,000 acres of the Property with third party, Preston Nutter, without Mr. Breland's knowledge or consent. The pre-sale became effective by this Court's approval of the ARA. Mr. Breland argues that his lack of knowledge or consent to the sale, and Levada's failure to inform this Court of the pending sale was a breach of the ARA, and created the basis for the fraud-on-the-court Adversary Proceeding. Levada contends the sale was valid because the express terms of

7

the ARA were not limited to future sales only, and thus Levada did not need Debtor's consent to pre-sell the property. During the Levada Lawsuit, Mr. Breland attempted to add this claim to his complaint for relief, but that request was denied by Judge Granade based on her finding that Mr. Breland knew of the sale prior to it going forward and that the sale of the property was valid under the express terms of the ARA.[5] This matter having been resolved by Judge Granade, is *res judicata* and brings no benefit or value to the Estate.

The Trustee testified that in composing the settlement, he reviewed the ARA, the record in sum of the individual case, the schedules in the *Osprey Utah* case, the record in the Debtor's 2009 bankruptcy case, Levada's proof of claim in both cases, the Donados' proof of claim, the Property deeds, and his own business judgment in other similar situations. He testified that because of the issues with the ARA set out above, the two Chapter 11 cases needed to be streamlined by way of settlement as opposed to filing a Section 363(h) motion to sell in the *Osprey Utah* case. He testified that an appraisal and auction of the property would cost the bankruptcy estate too much to make a § 363(h) motion worthwhile. This, despite testifying that there is approximately $1,000,000.00 in his trust account for this case. He also stated that it was his business judgment that the party most likely to pay the best price for the property was the other owner, here that party is Levada, not a third party purchaser, making a settlement the most efficient use of Estate resources. The Trustee testified further that even though the Debtor indicated to

---

[5] *See* Order dated September 30, 2015 (Doc. 108) in the matter of *Charles K. Breland, et al., v. Levada EF Five, LLC, et al.,* 14-158-CG-C. This Order interprets Section 10 of the ARA which states that "Levada shall be entitled, in its sole discretion, to sell the Subject Property at any time, to any party for any consideration without Osprey's consent . . . ."

8

him that there were interested third party purchasers, those purchasers were never identified by the Debtor, and the Trustee did not follow up on who those purchasers might be. Based on all of these circumstances, the Trustee testified that it was his business judgment that a settlement terminating the ARA in its entirety and transferring all of Osprey Utah's property rights to Levada would be the most economical and efficient method of streamlining these issues.

### The Property Appraisals

Along with the Trustee's testimony and his estimation of the value of the property, the parties also submitted expert testimony and their appraisals of the property for the Court's consideration. The Trustee submitted an appraisal secured by the receiving creditor, Levada, and the Debtor hired his own expert to survey the property. The Trustee testified that he did not hire his own independent appraiser to survey the property due to time and money constraints. While the Trustee specifically referenced time constraints, he gave no specifics regarding those constraints and testified that he knew of no reason why Levada would be in a rush to obtain Debtor's portion of the Property rights.

The appraisal submitted by Levada was compiled by Craig Warren, who was presented to and accepted by the Court as an expert in his field. Mr. Warren testified as to the valuation method he used in assigning value to the Property, and to the Property interests held by the parties. He surveyed the property physically, considered it as a whole based on the deeds conveying the respective rights, and then formulated reports as to both parties' percentage of rights. He testified that though he was aware of the ARA due to it being referenced in the deeds, he did not consider the ARA as giving future

9

rights to any owner or placing any restrictions on the Property. He also testified that to assign value to the parties' respective rights, he used the membership interests in cattle grazing associations of property located geographically distant from the Property, which he admitted was a different type of land than the Property. Mr. Warren acknowledged that several mistakes were present in his appraisal, but he believed none of them called into question his methodology or the value that he assigned to the parties' respective property rights. Based on his survey of the Property, he assigned a $6,690,000.00 value to Levada's interests in the Property and a $557,544.00 value to Debtor's interests in the Property. The Property interests combined would result in a $7.2 million total value of the remaining property.

The Debtor submitted his own appraisal of the Property compiled by Gordon Lowe, who was presented to and accepted by the Court as an expert in his field. Mr. Lowe stated that due to the fractional ownership interests, he applied an additional ten percent downward discount to both owners for that reason. He also testified that if the downward discounts due to partial ownership were removed, that the Property would likely be valued at $800.00 per acre, which would total an amount just shy of $11,000,000.00. He also testified that he was aware of and considered the ARA in his assignation of value to the parties' rights and concluded that the way the ARA is drafted, the allocation of ownership interests could change under the original terms of the ARA.

Mr. Lowe stated that the comparable properties he considered in formulating his appraisal had similar topography and used the actual market value to support his conclusions. He testified that at present, there is no infrastructure on the Property to

deliver or remove gas to the market, even though in his opinion extraction of minerals on this property is economically feasible.

The Court found both experts to be forthright and credible. Despite the differences between the two appraisals and whatever shortcomings each one may have contained, both experts agreed that the highest and best use of the Property at this time would be to hold the Property for investment purposes.

## THE LAWSUITS

The Trustee categorized the Lawsuits as having a negative, nuisance, and irritant value to the Estate. Regarding the two appeals pending in the Eleventh Circuit, the trustee contends that hundreds of thousands of dollars can be saved if those appeals are not prosecuted, and if the costs associated with posting supersedeas bonds are not incurred. The Trustee also noted a threat by Levada that it would seek future attorneys' fees regarding these Lawsuits if they are not resolved by settlement, which threat the Trustee appears to place significant value. In support of the settlement of the two appeals, the Trustee relies on the federal judicial caseload statistics, which indicate that the Eleventh Circuit affirms 88% of private civil cases decided below on the merits, leaving only a small 12% of cases being reversed or remanded. The Trustee asserts that the standard of review on appeal is abuse of discretion, a high standard indeed, which reduces the likelihood of success on the merits on appeal.

In regard to the Adversary Proceeding pending before this Court, the Trustee asserts that he would be able to avoid incurring attorneys' fees to prosecute a meritless and frivolous case. Though there are broad third party releases provided for in the settlement, the Trustee did not testify as to what value he placed on these releases. The

Trustee asserts that the settlement can and should be bifurcated, resulting in the dismissal of all three Lawsuits regardless of whether the proposed settlement on the property interests is approved. (Doc. 264 at 8).

CONCLUSIONS OF LAW

Rule 9019 of the Federal Rules of Bankruptcy Procedure states, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Although the court may consider the opinions of the trustee or debtor and their counsel that a settlement is fair and equitable, the judge cannot accept trustee's word that the settlement is reasonable, nor may the judge merely rubberstamp a trustee's proposal. *In re Greenberg*, 2005 WL 6746610, at *3 (Bankr. S.D.Ga. Apr. 5, 2005). However, the court should not conduct a "mini-trial" on the merits of the underlying litigation either. *Id.* "When faced with a motion to compromise, a court must inquire into the reasonableness of the proposed settlement, determining 'whether [it] falls below the lowest point of the range of reasonableness.'" *Id.* at *3.

In *In re Chira*,[6] the Eleventh Circuit stated that this Circuit relies on the *Justice Oaks* factors to evaluate a proposed settlement. Those factors include:

> (a) The probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection;
>
> (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;
>
> (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

---

[6] 567 F. 3d 1307, 1312–13 (11th Cir. 2009).

*Id.* at 1312 (*citing In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1549 (11th Cir. 1990). Courts consider these factors to determine "the fairness, reasonableness and adequacy of a proposed settlement agreement." *In re Chira* at 1312 *(citing In re A & C Prop.,* 784 F.2d 1377, 1381 (9th Cir. 1986). Where one of the four *Justice Oaks* factors is irrelevant to the facts of the case, it need not be considered in any meaningful way. *In re Chira* at 1307.

The Eleventh Circuit affirmed the Middle District of Florida in *In re Able Body Temp. Servs., Inc.*, 2015 WL 791281, at *5 (M.D. Fla. Feb. 25, 2015), *aff'd,* 632 F. App'x 602 (11th Cir. 2016) stating that "[b]efore a bankruptcy court approves a settlement that constitutes a sale of assets, the trustee must demonstrate an 'articulated business justification or sound business reasons for the proposed sale.'" *Id.* (*citing In re Moore,* 608 F.3d 253, 262 (5th Cir. 2010); *see also In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986)). While a Trustee's business judgment is given great deference in the approval process of a settlement, a court must nonetheless be informed of all the "relevant facts and information in order to make an independent judgment as to whether the settlement is fair and reasonable under the circumstances." *In re Vazquez,* 325 B.R. 30, 36 (Bankr. S.D. Fla. 2005).

Despite the Trustee's request to approve dismissal of the Lawsuits regardless of whether the Property interests are approved, this Court will not bifurcate the settlement as it would result in piecemealing the settlement in violation of the spirit of Rule 9019. *See In re Roper and Twardowsky, LLC,* 559 B.R. 375, 393 (Bankr. D. N.J. Nov. 9, 2016)(a

13

proposed settlement cannot be piecemealed because doing so would change the essential terms of the proposed settlement and would violate the purpose and spirit of Rule 9019 or it would decide issues not necessary). Accordingly, the Court will analyze the *Justice Oaks* factors in relation to the settlement as proposed *in toto.*

## APPLICATION OF THE *JUSTICE OAKS* FACTORS

This case has a long history. The same parties involved in this case are essentially the same parties that participated in the Debtor's 2009 case. The issues presented in the 2009 case were complex and ultimately intertwined with two unfavorable jury trials and one unfavorable bench trial in the District Court, all of which occurred on the eve of Debtor's filing of the instant case. The Debtor filed appeals in those cases, and this Court is now dealing with those appeals, as well as with the Adversary Proceeding borne from the Debtor's unfavorable results of those trials. The ARA is inextricably intertwined with the property interests and the Lawsuits, neither of which can go forward without additional litigation of the ARA. Continued litigation of the ARA, in any aspect, will only result in additional expense and disruption in this hard-fought, contentious case.

This Court has already examined the probability of success on the merits of the Adversary Proceeding and found that it has virtually no chance of success due to the findings made by Judge Granade in the Levada Lawsuit.[7] The Court has read the ARA multiple times and finds that many provisions of it are now an impossibility. A settlement terminating the ARA and divesting the Estate of these problematic property interests and unfounded appeals would indeed be efficient and economical, and thus of

---

[7] *See Charles K, Breland, Jr., et al. v. Levada EF Five, LLC, et al.,* 14-158-CG-C, (Doc. 108)

great value to the administration of this Estate. Moreover, the length of Debtor's 2009 case (which was only recently closed in October of 2016), as well as the length of the instant case (approaching its two-year anniversary with no disclosure statement or plan filed) highlights the complexity and the resulting expense, delay and inconvenience for all parties involved. Additional litigation over the ARA or the Lawsuits would only increase the expense incurred by the Estate, and would drain it of valuable assets that could be liquidated to pay creditors. While the Court notes that no creditor has objected to the proposed settlement, and the other relevant *Justice Oaks* factors support approval of the settlement, this Court nevertheless finds itself unapprised of relevant information upon which it may make an independent judgment as to the reasonableness of the settlement. *See In re Vazquez,* 325 B.R. 30, 36 (Bankr. S.D. Fla. 2005)(a court must be informed of all the "relevant facts and information in order to make an independent judgment as to whether the settlement is fair and reasonable under the circumstances"). Considering the facts and evidence presented, this Court further finds as follows.

## THE PROPERTY INTERESTS

### Appraisals

The Trustee presented an appraisal of the Property by expert Craig Warren. This appraisal was referred to as the "Trustee's appraisal;" however, that designation is a misnomer since the appraiser was actually hired by Levada. (*See* Doc. 764-1 at 2). Technically, the appraisal presented in support of the proposed settlement is a buyer's appraisal, a fact with which the Court takes issue.

The basis of the Trustee's appointment in this case is to ensure that, in compliance with the Bankruptcy Code, the interests of the Bankruptcy Estate and the creditors would be placed ahead of the interests of Debtors Osprey Utah and Mr. Breland.  This appointment process involved a series of extremely contentious evidentiary hearings, which resulted in an appeal by the Debtor to the United States District Court, which remains pending as of this date.  Because the Trustee's duties require him to administer the case in a manner that treats the interest of creditors and the Estate as paramount, he is charged with proposing a settlement that does not fall below the lowest point in the range of reasonableness.  Here, the Court finds that relying on the appraisal of the purchaser and one of the Estate's largest creditors is unreasonable.  It is even more unreasonable when viewed in relation to the sale by Levada to third party purchaser Preston Nutter, which has generated a great deal of ill will and contention in this case and the 2009 case.  The Trustee testified that it was his business judgment that the other owner of the property would be the party willing to pay the most for the property; however, the fact that Levada was able to sell a third of this property at a premium to Preston Nutter, calls into question whether this assumption is reasonable under the circumstances.  Without an unbiased, independent appraisal secured by the Trustee, this Court is unable to value the Property with sufficient certainty to determine the reasonableness of the settlement.

In addition to the failure to secure an independent appraisal, the Trustee testified that Mr. Breland made him aware of potential third party purchasers of the Property, but because Mr. Breland never supplied the contact information to the Trustee, the Trustee never made any additional effort to pursue those leads or determine what they may be willing to pay for the Property.  Instead, he assumed the only party willing to pay a fair

16
Case 16-02270    Doc 285    Filed 02/14/18    Entered 02/14/18 15:58:01    Desc Main
Document      Page 16 of 20

price for the Property would be the other partial owner (Levada). While that may be true, no evidence was presented to justify that conclusion.

Next, the Court takes issue with the Trustee's testimony that he never marketed the Property. He testified that it would require too much time and money to make marketing worthwhile when the other owner was on standby to purchase it. This despite also testifying that he knew of no reason this settlement needed to be rushed through to approval and, despite there being approximately $1 million in his trust account for this case. Because the best indicator of value is the market, and the Trustee failed to even attempt to market the Property, the settlement as proposed falls below the lowest point in the range of reasonableness.

Turning now to the appraisals and the content therein, the Court questions Levada's appraisal.[8] The Court is concerned mainly with the approach used in valuing the property, as well as the comparables used in relation to this piece of property.

Mr. Warren testified that the ARA was referenced in the deeds, but that he did not read the ARA as placing restrictions on the rights or transfer of the Property and thus did not include it in his assessment of the Property.

Additionally, the Court takes issue with the comparables that Mr. Warren used in formulating his appraisal. It is largely undisputed what type of property the Property is: steep, high desert, Alpine property with little water and questionable merchantable timber. The comparables used by Mr. Warren were admittedly geographically distant

---

[8] The mistakes in Levada's appraisal were pervasive, and the Court gives the appraisal its due weight in regard to those mistakes.

from the property, and were properties used for cattle grazing associations, which is not a current use of the Property.

Regardless of the values correctly or incorrectly assigned to the property interests by the parties and their experts, the one thing that both experts agreed on was that the highest and best use of the Property at this time was a "hold" for investment purposes to give the potential markets a chance to strengthen.

The settlement proposes to transfer all of Osprey Utah's surface revenue interests in the property, all of its mineral interests in the property, and all of Patmos Energy's[9] alleged interests in three pipeline taps and gas pipeline facilities agreements to Levada. This transfer of rights results in Levada obtaining *all* of the remaining Property rights, and by agreement completely terminates the ARA.[10] (Doc. 644 at 7). While the Court is not opposed to a termination of the ARA, additional unbiased evidence must be presented to ensure that proper value based on independent information has been given in exchange for termination of it.

The $1.5 million credit (including the $100,000.00 "sweetener") on Levada's claim for the transfer of all of the remaining property rights, compared to the assigned value of the property as a whole, between $7.2 million[11] (according to Levada's

---

[9] Like Osprey Utah, LLC, the Debtor is also the 100% owner of Patmos Energy. According to Section B(1) of the ARA, Patmos Energy was to transfer to Levada its interests in the Questar Pipeline gas taps. This transfer apparently never occurred, and became part of the breach of contract action in the Levada Lawsuit before Judge Granade.

[10] Levada is purchasing the Donado's 25% mineral interest in the Property for $150,000.00. (Doc. 264 at 7).

[11] $6,690,000.00 assigned to Levada and $557,544.00 assigned to Debtor.

appraisal) and $10.2 million[12] (according to Debtor's appraisal), without further unbiased evidence, seems to fall below the lowest point of reasonableness under the circumstances. *See In re Oakfabco, Inc.,* 571 B.R. 771, 775 (N.D. Ill. Aug. 4, 2017)(*citing In re Energy Co-op. Inc.,* 886 F.2d 921, 927-29 (7th Cir. 1989)("The value of the settlement must be reasonably equivalent to the value of the claims surrendered").

THE LAWSUITS

The Trustee has stated that he views the lawsuits as meritless and frivolous and not worth prosecuting. While the Court has heard enough evidence to believe the dismissal of the lawsuits may be warranted, the Trustee can dismiss these cases without the need to grant third party releases. Because the Court heard no testimony regarding the necessity or value of those releases, it cannot determine the reasonableness of the dismissals and releases when considered as part of the settlement as a whole.

CONCLUSION

For the reasons set forth above, this Court finds that the Trustee failed to carry his burden of proof in order for this Court to approve the pending Motion to Approve Compromise *in toto*. To be clear, this Court is not making a finding that the concept of settling these matters is unwarranted under the circumstances, but only that the Trustee did not submit sufficient evidence to prove a settlement under these terms meets the minimum standards of reasonableness.

If the Trustee believes that it is in the best interest of the Bankruptcy Estate to continue to pursue a resolution of these matters, the Court encourages the Trustee to

---

[12] $6,852,201.00 assigned to Levada and $3,374,964.00 assigned to Debtor.

address the Motion's deficiencies as set out herein and subsequently provide the Court with sufficient evidence of thorough marketing and an accurate assessment of the value of all aspects of a proposed settlement in any future motion. So that there will be no confusion among the parties as to the *res judicata* effect of any of the findings in this order, the Trustee's Motion to Approve Compromise is hereby DENIED *without prejudice*.

Dated: February 14, 2018

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE